Okay, Mr. Lyons, then you begin, okay? Thank you, Your Honor. It may please the court, Jeffrey Lyons, on behalf of Petitioner. Here, a claim for deferred removal under the Convention Against Torture requires the fact finder to determine the likelihood of future torture. And here, the undisputed facts are that Petitioner's estranged husband, Angel, a man who had raped and abused Petitioner for decades, claimed that Petitioner telling their turned his children against him and interrupted his supply of money to Guatemala from the United States, sent a letter to Petitioner detailing exactly how he will torture her if she's removed to Guatemala. He said he will gouge out her eyes, rip out her tongue, and when she's sent back to Guatemala, he will be waiting for her with open arms. She will die like trash. Our argument is that any reasonable adjudicator would conclude that Petitioner has established a greater than reasonable claim. The government argues twofold, that the time between the letter and the present, the letter was sent in 2017, and the lack of any threats since on how last threatened Petitioner demonstrate that it is not certain that Petitioner will be tortured if returned to Guatemala. But those same arguments were addressed by a dissenting judge with the BIA, Judge Pepper, who dissented from the majority, and she explained that the IJ clearly erred in finding that Petitioner had not demonstrated that it was more likely than not that she would be tortured if removed to Guatemala. The dissenting judge found the IJ's conclusions were not based on a permissible view of the evidence, and that the conclusion that Angel's hostility to Petitioner may have abated in the intervening time from 2017 to the present was not based on any Unfortunately for you, that was a dissenting opinion. I agree, your honor. And the, um, doesn't the standard of review matter here? Because there are a great many, a great many things here which are intensely factual. And that is, you know, what interpretation to be put on this remark and on that remark. And, it would seem to be a case where the IJs and the trier of facts will be much closer to the actual evidence and to the particular people involved than we are. Your honor, I don't agree that the, neither side disputes the standard of review. And here it's reviewing for substantial evidence. Admittedly, that's the case. We felt that the appeal was strong even before the dissent. I think if you look at the updated or supplemental administrative record, this dissent was just unearthed, I believe, two weeks ago. But it does, the dissent just mimics exactly what we say in our briefs. And we think it is a strong case here. Substantial evidence is a high burden. I think Ortiz-Cruz says that it is not toothless though. And it's the job of the Fourth Circuit to review for substantial evidence. And here, I'm hard pressed to find a reasonable fact finder that could reach a decision. And I'm not sure whether, had I listened to the evidence, I would have come down with the majority or whether I'd come down with a dissenting judge. I don't know. But I just am concerned about the fact that my vantage point is so much less immediate and so much less trustworthy than the actual prior fact. And your Honor, I think there's a few things going towards that. One, again, I think the facts here are about as egregious as you can find. They are undisputed. There's no question the petitioner was found credible by the IJ. There's no challenge to any of the evidence that we cite here. And I can't think of a case that I've reviewed or even heard of where the IJ's job is to make a prediction about the likelihood of future torture. And here, not only do we have the history of abuse and rape of petitioner and just egregious conduct by Angel, we have a letter where he says exactly that. He will wait in Guatemala, wait for petitioner. He knows that she's in immigration custody. He had been in America, and it's unclear if he had been removed to Guatemala or voluntarily sent back. But he knows the system. He has family here that knows where petitioner is and if she will be sent back to Guatemala. And he said he'll wait for her. And he said he would torture her if she's sent back. And the substantial evidence standard aside, we think here that any reasonable adjudicator should find that that's at least a 50 percent likelihood of the chance of she's removed. In addition to that, there is a legal issue, and that was the IJ and BIA's failure to aggregate the risk of torture from all sources. Petitioner submitted to the IJ substantial evidence from experts, articles, and government documents that shows that as a poor indigenous woman returning from the United States, that there's a chance that she could be tortured by gangs or police or just other men in the country. The IJ discusses that evidence, but says that on its own is insufficient to demonstrate her likelihood of torture. But that's a legal error. You need to combine that with the likelihood of torture by ANHEL. And so combining those, I think, even more so gets you over the hurdle. But again, it was legal error by the IJ and the BIA to not combine them in the first place. But Mr. Lyons, to vacate and remand on that ground, we don't even have to agree with you that it does get her over the hurdle. All we have to say is failing to consider whether it gets you over the hurdle is legal error. Is that your view? That's true. And that's our alternative argument. That would not be our first choice. Petitioner here has been in immigration custody for years. You know, a remand is not our first choice for further fact-finding. No, Mr. Lyons, I understand that. But I mean, since I take your point to be neither the IJ nor the BIA ever even considered if aggregating them gets her over the hurdle, we really can't in the first instance pass on a claim that the BIA never considered. I mean, I understand. But do you agree with that? Well, I think if the court now finds that based on the evidence, the undisputed evidence of record, that the legality of torture by Angel is greater than 50 percent or that the legality of torture, there's no substantial evidence to support that he would not torture her more than 50 percent. I think the court can disagree with that and send it back and just ignore it. No, I agree with that, Mr. Lyons. I'm just saying since the BIA never considered the aggregation question, I don't think we can consider the aggregation question in the first instance, can we? That's fair. That's fair. And so I think and the government makes a few arguments about how there was no substantial evidence in the record about the country conditions or about the likelihood that someone other than Angel would torture her. But again, there's hundreds of pages in the certified administrative record that detail how she could be tortured, how gangs frequently target women returning from the United States thinking that they have money from their time here. And if they don't pay, they can be murdered. And so I think there's substantial evidence there. And so it's not, I think the government has said it's harmless error that the BIA had not considered that evidence. I disagree. And if the court finds that the likelihood of torture by Angel alone is not greater than 50 percent, it's not harmless error and would need to go back. The follow up on this, the BIA is making the point that the aggregation evidence was including country conditions and the police and everything. It was very vague in general that it wasn't that the reason we can say it's harmless is that it was not sufficiently concrete. And I'd like to hear your response to that. What is the nature of the aggregation evidence that you would point to? Sure, Your Honor. Just off the top of my head, it's 179 in the administrative record to 473 covers, I think, most of the evidence that was in front of the IJ about so-called country conditions or the likelihood of torture by someone other than Angel. There's at least two expert reports specifically discussing Guatemala in general and the conditions there, and then specifically about Petitioner and her circumstances and how that would fit into the country. And that's where I pulled the information about women returning. I'm interested in the connection of the aggregation evidence to Petitioner specifically, not just general conditions. I'm open to hearing it. I just want to know what the aggregation evidence is that pertains to her. Well, for her, again, this is kind of a hypothetical. We need to look at the country conditions in general, and then at least the two experts that submitted affidavits to the IJ detail how Petitioner fits into that. And what that shows is that as an indigenous woman, as someone going back to a rural part of the country of Guatemala, she will be targeted by at least gangs looking for money. Because she's returning from the United States, the thought is that she has money. And they say that because she has no family support, nowhere to stay, she'll be an easy target of the gangs. They will ask her for money and demonstrate with research that women who don't pay these gangs can end up being murdered. And so I think there's general conditions, which the IJ had mentioned, but there's also tying Petitioner specifically to her status as an indigenous woman, as someone who would have no place to stay, ties those general conditions to her specific facts. And again, that's, I believe, 179 through 473 of the administrative record. Have there been any particular threats leveled at Petitioner from other than her husband? Direct threats, no. Petitioner has not been in Guatemala for over 30 years. All of the threats that would come from other than her estranged husband would be the types of things those experts had discussed in front of the IJ. She hasn't yet experienced those. But again, we're looking to the likelihood of future torture, which involves some level of prediction. And again, so the only direct threats would be from Angel. Let me ask you, how could you draw a conclusion that general country conditions, a person fits in a class that are mistreated in the country, a prediction that this particular person, more likely than not, will be so mistreated? I mean, there is thousands or millions of these people in these countries that fall in that classification. And she has to make the case that the risk is more likely than not that she'll be persecuted. Without even a threat or observation or anybody saying, I sort of thought that sounded like just pure speculation. And your honor, there is some degree of speculation with these cat claims. Again, we're looking at the likelihood of future torture. Here, there's not just reference to general country conditions and say, hey, you know, this could happen to me. Here, there's expert reports detailing how Petitioner specifically fits in a certain criteria and the likelihood that that criteria will then result in her torture. And again, we understand that the law is that general country conditions on their own cannot give rise to a greater than 50% chance of torture. But here, when you combine it with the very targeted, very direct, very real threats from her estranged husband. Yeah, but those are unrelated. In other words, one doesn't aggravate the other. His motive is not based on that classification. And the classification is not based on his particular relationship with his wife, which is abusive. It seems to me what the IJ focused on was isolating the letter based on the passage of time, based on the fact that she had not seen him since 2006, which is what 15, 20 years, whatever it is, 15 years. And based on the fact that they've been talking to the children since then, they related that comment to the children being notified and breaking the promise. And then following that, he's never made a threat again. And he's talked frequently with the children. So they isolated it and came to the conclusion that those circumstances are not more likely than not. And the question now is, okay, there's country conditions totally unrelated to that set of facts. It's not even based. He didn't mistreat her because of her classification. He mistreated her because of his pernicious sexual conduct. And I wonder how that's aggravating. In other words, that's an alternative possibility. When you aggravate, one contributes to the other, doesn't it? Your Honor, I am out of time. May I respond to that question? Please, please. So in Rodriguez-Arias v. Whitaker, they found it was legal error to not consider all sources. There was no indication that anything needed to be related. And I believe in Rodriguez-Arias. You consider all sources, but you have to get to the point where it's more likely than not. Now, when you have two disjointed alternatives, one is the domestic relations problem, and the other is general country conditions relating to her race, origin, and gender. One doesn't seem to stack on the other. They seem to be alternatives. And Your Honor, I think the legal precedent is that the cat claim is looked at in its whole. And I haven't seen no- I understand that. I understand that. Okay. Mr. Lentz, can I just ask you a hypothetical that I think might help me clarify this? Please. Say we think there's a 49% chance that her ex-husband would torture her. And we think that because she is an indigenous woman returning from the United States, there is a 2% chance that she would be tortured by a gang for that reason. And these are totally disconnected. They have nothing to do with each other. One is her ex-husband hates her because he's her ex-husband, and one is based on her status of an indigenous returning woman from the United States. And we think one is 49 and one is two, and they're completely unrelated. Do you understand our precedent to say that you have to put those two together and 49 plus two is 51, so she wins? I don't believe the precedent is that clear, but I would make that argument, yes. I think if you consider all possible sources of torture, which is what the precedent says, all possible sources, and determine that likelihood, when you put them together, if it's over 50%, then she has established her claim. I don't know if you'd ever get to a judge agreeing that 2% is the exact amount. Sure, no, sure. But I think that's a fair assessment. I think if she's established 51% via any source or all sources, then I think that she has established her claim. Adding percentages like that might not be statistically legitimate, but... I make no claims to be good at math or anything like that, but... Although I'm the last person to ask about that. All right, Ms. Glazer, let's hear from you. Good morning. May it please the court, Sherry Glazer appearing on behalf of the United States Attorney General. Your Honors, the government would ask that the court deny this petition for review because Ms. Lopez has simply failed to present any evidence compelling the conclusion she is eligible for deferral of removal under the Convention Against Torture. If I could just start out, Ms. Lopez makes an argument that the immigration judge never aggregated all sources of torture that she separately presented. The immigration paragraph on page 753, the immigration judge specifically said, considering the entire record and aggregating all potential torture by all possible sources, she has not shown she would face a clear probability of being intentionally subject to severe physical or mental pain or suffering if she had to return to Guatemala. So the immigration judge did, in fact, aggregate all sources of torture. And to the extent that... Ms. Glazer, before we get into the merits, I guess I will say this by a preface of, I am a former government lawyer. I fully understand the shoot the messenger problem, and I want to make clear that I am not shooting the messenger. But sometimes one wants to give the messenger a message so they can carry it back to the people who are not the messenger. I was surprised and not at all happy to discover that there was a dissent in this case that I just found out about right before oral argument. And I guess I would ask you to carry back to the relevant people that at least this member of the court was surprised, disappointed, and unhappy about that and would like assurances that this is not going to happen again with any frequency. I understand. It was not a situation I have ever encountered. And to be honest, I was disappointed also. I mean, of course, it was not what I expected. And I asked about how it happened. I received a short explanation, which I'm happy to share with you if you'd like. But yeah, it was very frustrating situation for me as well. And I'm happy to carry that message back. Thank you. Sure. And with regards to Ms. Lopez's argument that she's presenting before the court that one source of torture that she's claiming is by gang members or whoever, based on the fact that when she goes back to Guatemala, we presume that she has money, that was never presented to the agency. Her driving force throughout her proceedings really was her fear of torture at the hands of Angel. And the only other claim that was truly presented before the board and an indigenous woman. And there are several arguments that the government makes as to why this case is particularly appropriate for this court to find that it was harmless error. So she filed an initial application before her proceedings were administratively closed, so she could serve her sentence for child abuse. And then they were administratively reopened. And in her first application and in her declaration, she never mentioned her claim based on being an indigenous woman. That's on 1626 and 1651 to 68. She filed an amended application where she then included one sentence saying in addition to her husband and people who know I will be in prison, which was not presented before this court, I'm afraid people will torture me because I'm an indigenous woman with no one there to protect me. It's on 894. And all of her testimony in her merit hearing focused just on her fear of torture at the hands of Angel. And the only time this indigenous claim is even mentioned during her merit hearing is during her counsel's closing argument. And then on appeal to the board, again, with regards to probability, she just focused on Angel on pages 29 to 31 of her brief. And on page 31, she mentions the immigration judge's determination looking at the country conditions evidence and that it didn't show any real significant risk that she will suffer any And then she says that that was error, but she didn't point to any evidence whatsoever to say why, in fact, that was error. And then the rest of her. Miss Glaser, can I interrupt you? I mean, these are interesting arguments, I guess. There's a sentence in your brief, though, that I'm wondering how this is consistent with. Because as I recall, you say in the red brief, she made all the arguments she's making before this court before the BIA. And before this court, she very clearly relies on the gangs issue. And when I read the government's red brief, I read you to say, I mean, this was part of your argument. She made all these arguments before the BIA. And now you're telling me that she didn't make arguments before the BIA that she made before this court. And so I'm trying to put those two things together. Yeah, that's in reference to sort of what she says next in her brief to the board, and which is what the government is, what she argues in her opening brief. She concedes to an extent that the country conditions evidence does not meet her burden. And that's in her opening brief that even assuming her evidence of the generalized country conditions were not enough, she then turns the court to her testimony, which, again, was just with regards to on held. And that is an argument that she makes on 31 to 32 after she says that it's in error. So I understand your confusion a little bit. But really, it's that sort of concession that the country conditions evidence, you know, may not meet her burden of proof. But hey, the court should look at all the record evidence. And yes, of course, you know, this court's review is all the record evidence. But the testimony that she presented was not presented on her indigenous claim. The only question is, you mentioned that the IJ, you cited some language where you say you think the IJ addressed this aggregation argument. But it's pretty clear to me that the BIA didn't. I don't see anything in the BIA's decision that addresses an aggregation argument. Am I wrong about that? Well, I would agree that the board, because it didn't address her fear of harm based on on health because of the language in footnote two, it didn't aggregate her fear, the risk of harm of her fear of torture at the hands of on health with her risk of what with her fear of torture being an indigenous woman. But it did include the proper language with regards to her fear of torture at the hands of on hell on page three to four. But I'm not on hell. I'm talking about aggregating the harm from on hell and the harm from others because the board, you know, because it didn't address her indigenous claim. I mean, the government can't dispute that. It's just not in the decision. There's another sentence in your brief that struck me. This is on page 21 of your red brief. You say the government admits that this letter shows Miss Lopez may be at some risk of harm at hands of on health. That's a quote from page 21 of your red brief. So now to do something to you that would have mortified me when I was in your position. What risk of harm is the government willing to concede? She's at the hands of on health. I mean, you obviously don't think it's 51, but you obviously think it's more than zero. So what is the government willing to concede with a number? Is that what you're asking? Sure. You said some risk of harm in your brief. I'm a certain percentage on it. I don't know. Maybe 20, 25 percent because when we look at the entire record, you know, he was removed to Guatemala in 2007 and he left. He moved out in November 2006 and we look at everything that's happened. He called her in 2008. He called her in 2009. He called her in 2010 and he asked for money. And there's no record evidence that he threatened to harm her. And then there's no evidence that she spoke to him, had any contact whatsoever between 2010 and 2014. Who testified before the IJ? She did. Just her. Just her. Her husband didn't testify at all. None of the children testified at all. What do you make of that? I might have been more helpful if the children had testified, but, you know, I can't really speak on why they didn't testify. There was a document that she submitted at the beginning of proceedings. She obviously bears the burden under a cat claim. I'm just wondering why they weren't, you know, if there was evidence of torture, why there wasn't more concrete testimony put forward from probably not from the husband, but from the children who were still in the country. And the husband, I guess, is back in Guatemala and who knows where. But I wonder why there wasn't testimony from the children to say that our mother is at real risk from our father and who could have testified as to his demeanor or contact that he'd had with them. I mean, it seemed to me, you know, she bore the burden and it seemed to me that I guess there were three children in the United States and that would have been an integral part of the case. And I'm wondering why they weren't brought forward. It's a good question, Your Honor. I really don't know. You know, all we have are the letters that they submitted. I don't know exactly what they would have testified to. And, you know, all we have is her testimony. And what we have from her testimony is after 2010, she called him in 2014, asked for money, which he did not give her, but he didn't threaten to harm her in any way. And then we have the 2017 letter, which, yes, is threatening. The government can't dispute it. The letters in the record. It would have been highly advantageous for at least one of the children to come forward and say our mother is at real risk of harm from our father and the like. It just mystifies me why a lot of these cases mystify me, why someone other than the CAAT applicant wasn't brought forward to bolster the claim. Yeah. If I'm recalling correctly, there was a document that was submitted at the beginning of her proceedings that I can't remember if it was all or just one or two of her children were going to testify, but they didn't. And, you know, she appeared for her hearing and her counsel said she was... Did they submit applications or affidavits? They did submit letters and they submitted letters. To what effect? Well, they discussed that... Just one second. There's really no information in those letters compelling the conclusion that she's... He will torture her. So Jonathan, his letters on page 971 to... I'm sorry, 970 to 971. And he discussed that after Angel was removed, Angel would call him for money. He would reach out to him through Facebook. And after he confronted Angel about Zahira, after their mother told them that Angel would continue to call him, he would just call him from different numbers. There was no direct representation or contention made that Angel was going to torture this woman upon her return to Guatemala? Well, he said he feared, you know, for his mother, but there was nothing in his letter to bolster his mother's case. And the last time he spoke was six months before he drafted the letter, which was... It would have been sometime in the second half of 2019. And while he said that sometimes Angel would ask how Ms. Lopez is doing, when is, you know, when is her release date? That was it. And so they really just sort of had very general topics of conversation. And one thing about that is in her opening brief, Ms. Lopez argues that, oh, it was just speculation for the immigration judge to say that that one... Your view is that it's inconclusive. Exactly. That there wasn't anything in the letters that... One thing that's unusual about this case, I don't think it does... I don't think it bears directly on the CAP claim, but it's an odd kind of ironic note in the background is that Ms. Lopez herself was convicted of Maryland second degree assault for hitting her niece and causing a three quarter inch laceration, which required stitches and staples to close. Now, here she's the one complaining of some sort of abuse where she was a significant abuser herself. I agree. I agree. That's a very unusual case in that way. And, you know, her conviction, of course, she's not eligible for asylum and withholding of removal because it's a particularly serious crime, which is not an issue before the court. But yeah, it's a little bit of a, I don't know if a hypocritical claim is really the right word, but she's claiming... Her CAP claim is based on this abuse that she inflicted on somebody else. So it's an interesting case in that way. Can I go back to these letters? So I'm looking at J167, and this is a letter, I believe, from one of her children. And it seems like it does corroborate some of her testimony. It says, I do not know where my mother would live. It says that the person worries about the Angel harming her. I mean, that's completely consistent with her testimony, isn't it? In terms of concern for her going back, yes, but... Well, in concern about him particularly, like concern about him particularly, and you put that together with he's asking about her, I guess. Let me take another step back. I'm not wrong about this. The IJ specifically found her credible, right? The IJ did not say, ma'am, I've listened to everything you said. And with respect, I think you're exaggerating. With respect, I don't believe you. The IJ didn't say any of those things, did the IJ? No, no. So then we have to assume that every word she testified to about the horrific abuse she endured from this man for years and years and years is all true. We have to assume that every single thing of that is true. Yes, absolutely. And then he writes her a letter in 2017 saying what he intends to do to her if he ever gets her back in Guatemala. He says that, right? And then the children write letters saying, our father asks about our mother, including when she's going to be released. And we have to assume that's true. Yes. Okay. So why in the world is that not enough? Your friend on the other side said it's hard to think of. I mean, yes, would it have been even better if the children took the stand and gave testimony? But we affirm criminal convictions all the time where I could imagine additional evidence the government could have presented in addition to the evidence that they presented. But that's not the question. The question is whether the party with the burden of proof presented enough evidence to say that the fact finder was required to find in their favor. And so I don't necessarily know how we can speculate what other evidence she would have presented that would have made her case even stronger. I understand your question. And, you know, I would argue that she didn't present evidence compelling the conclusion that it's more likely to not people torture her. And what I would point the court to is the case that the case of Ortez Cruz and Ortez Cruz was a little bit different than this case. And Ms. Lopez cites it in her reply brief, but she cites the withholding of removal discussion, which is regarding issues that have nothing to do with a cat claim. And the court denied the cat claim in that case. And in that case, that woman suffered abuse. It's very similar to what Ms. Lopez suffered. And she came to the United States and I believe it was 2000. And then her friend told her that her husband had made it to the United States in 2002, 2003, threatened to kill her and was removed to, I think it was Honduras. And then a lot of time passed. And in 2016, I believe it was two weeks before her hearing, she received a message from him. Now the government admits that is a little bit different, but the case that this court compared the circumstances in Ortez Cruz to was a Ninth Circuit case RA, which is very, very different than what we have here. In that case, it was a woman from Cameroon who again, experienced the same level of abuse as Ms. Ortez Cruz and Ms. Lopez. And she moved to South Africa and she was granted refugee status in South Africa. And she was there for seven years. And during those seven years, her ex-husband kept looking for her, threatening her through friends, tried to kidnap her children who it seems stayed in South Africa. And that continued for the entire seven years. And then, oh, I can't remember the year. I believe it was, it was shortly before her hearing. She went back to South Africa, I'm sorry, to Cameroon because her brother had died. And her partner, former partner started threatening her friends, found out she was back there, started threatening them and found out where she was. She was hiding in a church and tried to rape her on the streets. And that all happened very soon before her merits hearing. It was a year, maybe a year and a half before her merits hearing. And the court said, well, the circumstances in Ortez Cruz are nowhere near as egregious and we're nowhere near as constant as the circumstances in RA. And again, the government admits that the circumstances here may not be completely the same as Ortez Cruz, but they're nothing like what happened in RA because One of the things that you always worry about the original impetus for the asylum statute was to deter against abuse at the part of public authorities on the part of government. Now, it seems to have spread to abuse at the hands of private entities, which is far, which is a bit away from its animating purpose. And you worry about injecting courts into the middle of domestic relations disputes. Because gosh knows how many domestic relations disputes there are, there must be millions. And there's always lurking in the background an element of retribution and revenge and that kind of thing. I just worry that the statute is going to stray from its purposes because we gosh knows there are way too many of them in our own country. And this whole idea that we're the police against private violence, when in our own country, we don't do a very good job of it. It just makes me concerned about how broad and open ended this statute is becoming. I can understand, you know, when, unfortunately, when someone presents a cat claim or any sort of the agency has to adjudicate the way it's presented. And as does this court and government would just argue that, as I presented my brief, when the record is looked at as a whole, which includes all of the communications that she's had with on health, and of course, it includes the letter also, but the fact that he could have targeted her not targeted for threatened her since the letter didn't before and they spoke so many times that this case is distinguishable from what this court called the serial abuser cases in Ortiz-Cruz. And this is not. Thank you. Thank you, Your Honors. Mr. Lyons, what's the limiting principle here? I'm sympathetic to the circumstances of your client. But on the other hand, I don't want the courts just jumping into every domestic relations case. I don't want us, you know, to be a domestic relations court or a divorce court or or what have you. And I'm concerned about that. And I'm also concerned about the fact that we are beginning to the private violence is beginning to be the focus of the asylum statute. And that was not its animating purpose. The animating purpose was this. And I'm wondering, where is the limiting principle in your case? So in this case, and I understand your honor's concern here, I think it's twofold. One is the severity of the abuse suffered by petitioner and including the 2017 letter, which to go back to a after Angel realized petitioner had told his children that he was a child molester. So that gap from 2006 to 2017, I think, is tempered by the fact that he had just found out that he had been outed as a child molester. But the other side is there's substantial evidence in the record that demonstrates that domestic violence in particular in Guatemala is not remedied by the government. And in fact, the IJ had mentioned a few times that there were government programs in place that were trying to rectify this specific issue. But there's expert testimony that the government is purposefully understaffed, that these things were just said to make the government and the country look better. But in fact, in real life, Yes, but our cases say that ineffectiveness in stopping crime is not being unwilling or unable to do so. My gosh, one can make the case that this country is ineffective in stopping all kinds of things that should be stopped, including domestic abuse. And the question I have for you is, again, I'm sympathetic to the circumstances that your client may face. I understand that. But isn't this kind of embitterment? And, you know, some of the some of the angriest confrontations of all occur, unfortunately, deeply unfortunate between spouses. And what I'm just not sure how this separates. I mean, these things expand in a hurry and everybody comes before us and say, Oh, your honor, this is limited to these facts. So this, this case, and it never turns out that way, because it's thrown up at us time and time again. It's certainly how do we can I think we can look at the substantial evidence that's in the record of the Guatemalan government, especially not only failing to, to prevent this type of crime at this time of this type of abuse, but the specific instances where it there are documented instances where women are told by the police to try to reconcile. There's there's inherent problems, I think, there with the government, and not only the ineffective ability of the government to prevent this crime, but but to to remedy the fact when when an abused person goes to the police or goes to a government official, nothing is done. And Mr. Lyons, Mr. Lyons, if you're wrong about that, that if you're wrong about that, the IJ and the BIA could rule against you on that ground, right? That if that if you you'll present the argument, but I guess I guess a factual question then followed up by a legal question. The factual question is, that isn't the ground the BIA ruled against your client on, is it? The BIA didn't say she's going to be tortured by her horrible husband, but the government or the immigrant is not shown that the government won't protect her. That's not the ground they ruled against you on, is it? The BIA, no, the BIA specifically did not address the acquiescence prong. We think that the the IJ's decision on acquiescence, while we we disagree with it, was was fulsome enough to warrant review by by this panel. The the laws that you can as as the fourth circuit can review both the BIA and the IJ decision. Well now that that you know that principle is is heavily cabined because the statute says we only review the BIA order and the exception is when the BIA incorporates or adopts the IJ's order, then we'll review it because it's part of the BIA's but the language you quoted was a shorthand view for stating that and all our supporting cases point out that the statute requires us to review only the BIA order and I was going to raise that question here because both you seem to quote the same case which you just gave the shorthand view that we can review the IJ's order but the only time we can do so is when the BIA makes all or its own decision. Your honor, I agree that the BIA decision here was not as explicit but I do think it's a problem when the BIA specifically chooses not to address this acquiescence prong and we have to look at it in the context of our client has been you know detained for for years on this point but I agree that it's at least a possibility that we would seek a remand to at least consider that. I see my time is up. If I could say one case to Judge Hyten's question from before, is that okay? That would be helpful to me. Very, very quickly. Yeah, certainly. It's Kamara, the attorney general. It's from the third circuit and it specifically uses percentages from two circumstances of the likelihood of torture and combines them to reach the 50% threshold and that is cited in the Alvarez case. All right, thank you both. We appreciate it and we will adjourn court and retire to our conference room. Thank you. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Toby J. Heytens